**Arnold N. MONTAQUILA et al.**

v.

**Albert ST. CYR et al.**

**No. 78–373–Appeal.**

Supreme Court of Rhode Island.

Aug. 4, 1981.

Edward John Mulligan, Warwick, for plaintiffs.

Frank J. Williams, Martin W. Aisenberg, Providence, for defendants.

## OPINION

SHEA, Justice.

The plaintiffs in this case, Arnold N. Montaquila, K. George Joovelegian, Harold A. Joovelegian, and Frederick G. Tobin, were the solicitor and the assistant solicitors, respectively, for the town of Coventry. They had been appointed at a time when the members of the Democratic Party were in control of the town council. Local elections were held in November 1976, the result of which was to place the council under the control of the members of the Republican Party. The new council appointed Albert St. Cyr town manager pursuant to article V of the Coventry Home Rule Charter.

In a letter dated November 22, 1976, Montaquila's appointment as solicitor was terminated effective with the official seating of the new town council that evening. The termination, however, did not take effect until November 23 as Montaquila obtained a restraining order from a trial justice of the Superior Court on November 22, which was subsequently vacated on the following day.

In addition to the Montaquila letter of November 22, St. Cyr also wrote a letter appointing Frank Williams the new town solicitor. This appointment was approved by the town council at a special council meeting held on November 23. Also at this special meeting, the newly appointed Williams terminated assistant solicitors Harold and George Joovelegian, Tobin, and Arthur Capaldi.[1]

The plaintiffs thereafter brought an action in the Superior Court alleging that their dismissals violated the First and Fourteenth Amendments to the United States Constitution; that the dismissals were void under the provisions of the Coventry Home Rule Charter; and that defendants, the members of the town council and the town manager conspired to deprive plaintiffs of their rights in violation of 42 U.S.C.A. § 1983 (1974).

In a decision dated December 13, 1976, the trial justice found that plaintiffs were, in fact, dismissed solely for political reasons. Nevertheless, he held that their positions were such that they were subject to an absolute right of discharge. He found that the solicitors were policymakers and, as such, enjoyed no protection from politically motivated dismissals. Consequently, the trial justice denied plaintiffs' request for a preliminary injunction and dismissed the complaint.

The plaintiffs appealed the dismissal of their complaint to this court. *Montaquila v. St. Cyr*, R.I., 385 A.2d 673 (1978). It was held that since plaintiffs had no notice that a decision on the merits was being consolidated with a decision on the application for a preliminary injunction, a potential for unfairness existed. The plaintiffs therefore were entitled to a full hearing on the merits. This court remanded the case for a hearing on the merits. The plaintiffs, before the Superior Court, agreed to rest on the transcript and exhibits of the previous hearing for a preliminary injunction and on written memoranda. No new evidence was

offered. On September 22, 1978, a second justice of the Superior Court dismissed the complaint. He agreed with the decision of the first trial justice, finding that plaintiffs had no protection from politically motivated dismissals under the Constitution or the Home Rule Charter. The plaintiffs once again appealed to this court.

We begin our discussion of the case by stating that we agree with the justices below who found that the dismissals of the solicitor and his assistants were for purely political reasons. The record contains no evidence indicating that plaintiffs were not performing their duties competently. We now turn to plaintiffs' claim of constitutional deprivations.

I

In a 1976 plurality decision, the United States Supreme Court held that the politically motivated firings of non-civil-service governmental employees were unconstitutional under the First and Fourteenth Amendments. Specifically, the Court found that patronage dismissals violate an individual's freedoms of belief and association and interfere with the free functioning of the electoral process. *Elrod v. Burns*, 427 U.S. 347, 356, 96 S.Ct. 2673, 2681, 49 L.Ed.2d 547, 555 (1976).

The controversy in *Elrod* involved the firing of employees in the office of the sheriff of Cook County, Illinois. In December 1970, Richard Elrod, a Democrat, replaced the previous Republican sheriff. As had long been the practice in this department when a different political party assumed office, non-civil-service employees were replaced with individuals belonging to the incoming party. In passing on the constitutionality of patronage dismissals, the Court was confronted with a tradition the roots of which were traceable, at the federal level, at least as far back as the presidency of Thomas Jefferson. *Id.* at 353, 96 S.Ct. at 2680, 49 L.Ed.2d at 553–54.

---

1. Assistant Solicitor Capaldi was not a party to these proceedings. Williams also appointed new assistant solicitors: Bennett Gallo, Arthur A. Thovmasian, Jr., and Raymond R. Pezza. The council acquiesced in these appointments.

The Court's constitutional analysis centered around the restraint that patronage places on the freedoms of belief and association. The Court reasoned that an employee who is a member of the out-party maintains affiliation with his own party at the risk of losing his job. Further, if the employee is required to provide financial and campaign assistance to the in-party to keep his job, it is tantamount to coerced belief as the employee is being induced to advance the other party's policies to the detriment of his own party's views and to his own beliefs. *Id.* at 355, 96 S.Ct. at 2681, 49 L.Ed.2d at 554–55.

The second constitutional question concerned the restrictions that political patronage places on the free functioning of the electoral process. "Conditioning public employment on partisan support prevents support of competing political interests. Existing employees are deterred from such support, as well as the multitude seeking jobs." *Id.* 427 U.S. at 356, 96 S.Ct. at 2681, 49 L.Ed.2d at 555. The result of this practice, according to the Court, is to tip the electoral process in favor of the incumbent party. Basing its decision on the above analysis and relying primarily on *Keyishian v. Board of Regents*, 385 U.S. 589, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967) (invalidating New York statutes barring employment to members of "subversive" organizations), and *Perry v. Sindermann*, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972) (prohibiting dismissal of a state-university professor in retaliation for his exercise of free speech), the plurality concluded that patronage dismissals clearly infringe First Amendment interests. *Elrod v. Burns*, 427 U.S. at 360, 96 S.Ct. at 2683, 49 L.Ed.2d at 558.

Nevertheless, the Court was unwilling to invalidate all patronage dismissals. Noting that First Amendment protections are not absolute the Court found merit in the claim that there is a need for the political loyalty of employees, "not to the end that effectiveness and efficiency be insured, but to the end that representative government not be undercut by tactics obstructing the implementation of policies of the new administration, policies presumably sanctioned by the electorate." *Id.* at 367, 96 S.Ct. at 2687, 49 L.Ed.2d at 562. As a result, the Court limited its holding to nonpolicymaking employees. These persons usually have only limited responsibility and are not in a position to thwart the goals of the in-party. *Id.*

The major unsettled area of law on this issue since *Elrod* has been the scope of its coverage. The plurality was of the opinion that the line ought to be drawn between policymaking and nonpolicymaking employees. Justice Stewart, in a concurring opinion (joined by Justice Blackmun) felt that nonpolicymaking, as well as nonconfidential employees, could not be discharged on the sole ground of their political beliefs.

Next came the case of *Branti v. Finkel*, 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980). The Court held that the continued employment of an assistant public defender could not properly be conditioned on his allegiance to the political party in control of the county government. Here, the Court changed the focus of the inquiry in regard to which employees may be discharged for solely political reasons.

> "In sum, the ultimate inquiry is not whether the label 'policymaker' or 'confidential' fits a particular position; rather, the question is whether the hiring authority can demonstrate that party affiliation is an appropriate requirement for the effective performance of the public office involved." *Id.* at 531, 100 S.Ct. at 1295, 63 L.Ed.2d at 583.

It is clear from *Branti* that we are left with a very broad standard for determining the proper scope of protection for non-civil-service employees.

The issue before us is whether the positions of town solicitor and assistant town solicitor are those in which political "party affiliation is an appropriate requirement for the effective performance of the public office involved." The duties of the town solicitor for Coventry are listed in art. VII, § 7.03, of the Home Rule Charter for the Town of Coventry. This section provides as follows:

"The town solicitor shall serve as chief legal advisor to the council and to the town manager.

"The town solicitor shall appear for and protect the rights of the town in all actions, suits, or proceedings, civil or criminal, in law or equity, brought by or against it, or for or against any of its departments, offices, or agencies, including the council, the manager and the school committee.

"The town solicitor shall also perform such other duties, appropriate to his office, as the council and the manager may require.

"The town solicitor shall examine and approve the form of all ordinances and resolutions, of all invitations to bid, contracts, and other legal documents issued by any department, office or agency of the town."

On examination of the duties listed above, we conclude that the Coventry town solicitor and his assistants are not entitled to First Amendment protection from patronage dismissals. It is obvious that party affiliation is an appropriate standard to guide selection of solicitors by the town manager. A town solicitor holds an important and sensitive position in ensuring the implementation of the policies of the administration. This arises as a result of the role that a town solicitor plays in the formation of policy. While he may not be a policymaker per se, he is nevertheless privy to the discussions and information involved in the policymaking process in his role as chief legal advisor to the town. This sensitive position requires trust and loyalty between the town administration and the town solicitor. Party affiliation is a permissible way for the town manager to ensure that the necessary trust and loyalty exist.

The necessary involvement by a town solicitor in the policymaking process and his confidential relationship with the policy-makers are the key factors that warrant our not affording First Amendment protection against patronage dismissals. A recent federal case involved the question of whether the superintendents of the bureaus of highway and refuse in Scranton, Pennsylvania could be discharged for purely political reasons. *Loughney v. Hickey*, 480 F.Supp. 1352 (M.D.Pa.1979). Deciding this issue under the framework enunciated in *Elrod*,[2] the court concluded that:

"Our only present concern is whether Plaintiffs were municipal employees who were advisors to a policymaker and who constantly participated in and were privy to the discussions and information involved in the policymaking process. That is the type of government employee who is not protected by *Elrod* and who is therefore subject to discharge solely because of his political affiliations and beliefs." *Id.* at 1363.

This decision was based on *Rosenthal v. Rizzo*, 555 F.2d 390 (3d Cir. 1977), where the Third Circuit Court of Appeals interpreted the thrust of the plurality in *Elrod* to be "directed at policy formation and representative government." *Id.* at 393 n.5. Withholding *Elrod*-type protection from those employees involved in the "process" of establishing policy, as was done in *Loughney* and *Rosenthal*, is especially appropriate in view of *Branti*'s less restrictive test.

The plaintiffs have argued that since the Supreme Court extended *Elrod*-type protection to assistant public defenders in *Branti*, we must reach the same result here. That result does not follow. The Court in *Branti* clearly based its holding on finding that a public defender is not a policymaker and is not involved in the policymaking process, nor is he a confidential employee in the sense that partisan loyalty is necessary.

"Thus, whatever policymaking occurs in the public defender's office must relate to the needs of individual clients and not to

---

2. This decision was written before the Supreme Court changed the focus of the inquiry from policymaker/nonpolicymaker to party affiliation being an "appropriate requirement" for the office involved. *Branti v. Finkel*, 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980). The decision of the Federal District Court was later vacated by the Third Circuit Court of Appeals for reconsideration in light of *Branti*. *Loughney v. Hickey*, 635 F.2d 1063 (3d Cir. 1980).

any partisan political interests. Similarly, although an assistant is bound to obtain access to confidential information arising out of various attorney-client relationships, that information has no bearing whatsoever on partisan political concerns. Under these circumstances, it would undermine, rather than promote, the effective performance of an assistant public defender's office to make his tenure dependent on his allegiance to the dominant political party." *Branti v. Finkel*, 445 U.S. at 519–520, 100 S.Ct. at 1295, 63 L.Ed.2d at 584–585.

Finding that the duty of an assistant public defender is primarily to his clients, the Court specifically contrasted that situation with the broader responsibilities of an official like a prosecutor. The Court expressed "no opinion as to whether the deputy of such an official could be dismissed on grounds of political party affiliation or loyalty." *Id.* at 519, 100 S.Ct. at 1295 n.13, 63 L.Ed.2d at 584.

In this regard, our decision is closer analytically to the federal court decision of *Newcomb v. Brennan*, 558 F.2d 825 (7th Cir.), *cert. denied*, 434 U.S. 968, 98 S.Ct. 513, 54 L.Ed.2d 455 (1977). In *Newcomb*, a deputy city attorney in Milwaukee was fired when he announced his candidacy for the United States Congress. Claiming that his First and Fourteenth Amendment rights had been violated, the attorney sought to have *Elrod*-type protection against his discharge. The Seventh Circuit Court of Appeals found that even though the city attorney himself is the elected official responsible for setting the policy of the city attorney's office, a deputy city attorney makes many decisions that "involve implementation of the policies of the city attorney's office as a whole." [3] *Id.* at 830. This situation is similar to the instant case since the town solicitor and his assistants are intimately involved in implementing the poli-

cies of the town's administration in their role as chief legal advisors.

Finally, in *Jafree v. Scott*, 372 F.Supp. 264 (N.D.Ill.1974), *aff'd in part, reversed and remanded in part*, 519 F.2d 1405 (7th Cir. 1975),[4] an assistant attorney general in Illinois was fired for his criticism of alleged discriminatory hiring practices within the department. The court noted that the attorney general's duties included representing the people of the state and acting as the sole legal advisor to the state officers. Concerning the relationship of the assistants to the attorney general, the court stated:

> "It is only through these Assistants that the Attorney General can give guidance to public officers, appear in open court, attend meetings of public officials and otherwise act as the chief legal officer of the State of Illinois. * * * It is axiomatic, therefore, that the Attorney General in selecting and retaining employees must have the personal loyalty and confidence that each Assistant will aid in fulfilling the Attorney General's public mandate." *Id.* at 273.

This language describes the same type of relationship that exists between the parties to this action. The Coventry Town Council and the town manager must have the personal loyalty of, and confidence in, the solicitor and the assistant solicitors to ensure that they may be able to carry out the public's mandate. Thus, in view of the nature of the inquiry as enunciated in *Branti*, we hold that party affiliation is an appropriate requirement for town officials to use when selecting their solicitor and assistant solicitors. Therefore, the dismissals of the present solicitor and assistant solicitors who are members of the out-party do not violate plaintiffs' freedoms of belief and association as guaranteed by the First and Fourteenth Amendments.

---

**3.** The court in *Newcomb v. Brennan*, 558 F.2d 825 (7th Cir. 1977), specifically found that the deputy city attorney was a policymaker. We feel that this is no longer necessary in light of *Branti v. Finkel, supra*.

**4.** *Jafree v. Scott*, 372 F.Supp. 264 (N.D.Ill. 1974), *aff'd in part, reversed and remanded in part*, 519 F.2d 1405 (7th Cir. 1975), predates both *Elrod v. Burns*, 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976) and *Branti v. Finkel, supra*.

## II

The plaintiffs next contend that their dismissals violated the due-process clause of the Fourteenth Amendment in that they did not receive notice and a hearing at the town council before termination. When protected interests are involved, the right to some kind of prior hearing is paramount. *Board of Regents v. Roth*, 408 U.S. 564, 569–70, 92 S.Ct. 2701, 2705, 33 L.Ed.2d 548, 556 (1971). *Roth* requires only that a liberty or property interest be affected before due process applies. The range of protected interests itself is not paramount. *Id.* at 571, 92 S.Ct. at 2706, 33 L.Ed.2d at 557.

On the issue of whether or not a liberty interest exists in continued employment, the Supreme Court has said "[w]here a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him, notice and an opportunity to be heard are essential." *Id.* at 573, 92 S.Ct. at 2707, 33 L.Ed.2d at 558 (*quoting Wisconsin v. Constantineau*, 400 U.S. 433, 437, 91 S.Ct. 507, 510, 27 L.Ed.2d 515, 519 (1971)).

In *Roth*, the Court found that the state, in declining to rehire a nontenured assistant professor, "did not make any charge against him that might seriously damage his standing and associations in his community." *Id.* We are faced with a similar situation here. The record is devoid of evidence pointing to any damage to plaintiffs' reputations or standing. When a public employee is discharged from a position terminable at the will of the employer and there has been no public disclosure of the reasons for the discharge, there cannot be a deprivation of a liberty interest. *Bishop v. Wood*, 426 U.S. 341, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976). Both conditions are present here as the Coventry Home Rule

Charter, art. VII, § 7.01, indicates that the town solicitor serves "at the pleasure of the manager" and no public disclosure accompanied the discharge. Thus, there is no liberty interest in continued employment that warrants the application of the due-process clause.

In the determination of whether plaintiffs have a property interest in continued employment, a "legitimate claim of entitlement" must be shown. *Board of Regents v. Roth*, 480 U.S. at 577, 92 S.Ct. at 2709, 33 L.Ed.2d at 561.

> "Property interests * * * are created and their dimensions are refined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Id.*

We are unable to discern anything in the record that supports plaintiffs' claim of entitlement. As stated previously, the charter provides that the solicitor serves "at the pleasure of the manager." There is nothing to indicate that there has been any understanding to the contrary. In our opinion the political nature of plaintiffs' positions renders any belief of entitlement to future employment unfounded, absent firm understandings to the contrary.

In sum, the cases cited by plaintiffs in support of their due-process claim are not applicable since in each of them a legally protected interest did exist.[5] We hold that the due-process clause of the Fourteenth Amendment has not been violated since these plaintiffs have not shown the existence of a legally protected liberty or property interest in continued employment. The plaintiffs therefore were not entitled to notice and an opportunity to be heard prior to their termination.

---

5. *Goldberg v. Kelly*, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970) (property interest in the continued receipt of welfare benefits under statutory and administrative standards defining eligibility).

*Fuentes v. Shevin*, 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972) (property interest in one's goods and chattels in the face of statutory authorization for summary seizure).

*Bell v. Burson*, 402 U.S. 535, 91 S.Ct. 1586, 29 L.Ed.2d 90 (1971) (property interest in the continued possession of one's driver's license which is essential in the pursuit of a livelihood).

*Morrissey v. Brewer*, 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972) (liberty interest in a parolee's right to an informal hearing before a parole can be revoked).

## III

The plaintiffs next raise questions of improper action by the town council in violation of the charter. First, plaintiffs claim that the town council violated art. XV, § 15.11, of the charter by having the new town solicitor, Frank Williams, send letters of termination to plaintiffs on behalf of the town council. Section 15.11 prohibits the council from dealing directly with town officers who are subject to the supervision of the town manager. The record fails to substantiate plaintiffs' claim. At the special town council meeting held on November 23, 1976, the president of the town council, Arnold Blasbalg, read into the record the letter sent to plaintiff Arnold Montaquila by the new town manager, Albert R. St. Cyr, notifying him of his termination.[6]

The letter sent by Williams to Montaquila is dated November 24, 1976. It does not purport to be a termination notice. The purpose of this letter was to request that a meeting be held between Montaquila and Williams to effect a transition. The letters that Mr. Williams sent to the assistant town solicitors notifying them that they were being terminated were proper. Mr. Williams was appointed town solicitor on November 22, 1976, by Town Manager St. Cyr. Thus, under art. VII of the charter, Mr. Williams had the authority to dismiss his assistants.

## IV

■ The second alleged violation of the charter is that the November 23, 1976 special town council meeting was void because each council member received notice of the meeting less than the required twelve hours before the meeting. This contention is without merit as art. III, § 3.13, of the charter provides for waiver of the notice requirement and notice was so waived.[7]

## V

The plaintiffs next contend that their dismissals violated art. XV, § 15.10(a), of the charter which provides that no person shall be removed from a town position because of political affiliation. Even though plaintiffs enjoy no constitutional protection against politically motivated dismissals, a provision in the charter granting that protection must be honored if it is applicable.

■ As stated previously, § 7.01 provides that the town solicitor serves "at the pleasure of the manager". We construe the words "at the pleasure" to mean that the town manager may remove the solicitor for any reason except one that violates the constitution. *Patterson v. Ramsey*, 413 F.Supp. 523, 531 (D.Md.1976).[8] Since the constitution does not afford any protection to plaintiffs, the question comes down to whether or not the drafters of the charter intended to treat the removal of a town solicitor differently from that of others holding appointive positions who are protected by § 15.10(a).

On the basis of our reading of the charter as a whole, we conclude that the drafters' intent was to treat the town solicitor differently. He serves "at pleasure" and is not

---

**6.** The letter reads as follows:

"November 22, 1976

Dear Arnold:

Pursuant to the provisions of Section 7.01 of our Town Charter your appointment as Town Solicitor for the Town of Coventry is hereby terminated effective with the official seating of the new Town Council during the November 22, 1976 Council meeting.

I would like to take this opportunity to thank you for the excellent legal representation which you provided the Town during my brief tenure. I have enjoyed working with you.

Sincerely,
Albert R. St. Cyr,
Town Manager."

**7.** Councilman James Carroll was unable to attend the special meeting, but Council President Blasbalg indicated for the record that Carroll concurred in the waiver of notice. This procedure is not improper under the charter since all that is required is that a member waive the notice requirement and that such waiver be entered into the record. There is no requirement that a member be present to effect a waiver.

**8.** The decision in this case upholding the dismissal of a school superintendent was affirmed on appeal in *Patterson v. Ramsey*, 552 F.2d 117 (4th Cir. 1977).

protected by the prohibition against politically motivated dismissals. This reading of the charter is in accordance with our practice of construing and applying apparently inconsistent statutory provisions in such a manner so as to avoid the inconsistency. *State v. Goff*, 110 R.I. 202, 205, 291 A.2d 416, 417 (1972); *State v. Haggerty*, 89 R.I. 158, 161, 151 A.2d 382, 384 (1959).

We believe that this result is the only reading of the charter which lends itself to consistency. There are other officials besides the solicitor for whom special provisions have been made in the charter. For example, the judge of the probate court is appointed by the council under the provision of art. VI for a term concurrent with the council's and until a successor is appointed. Since there is no provision allowing removal of the probate judge "at pleasure," he is protected from politically motivated dismissals under § 15.10(a) during the term of the council. Under art. IX, the manager is authorized to appoint a director of records and personnel whose term of office is designated as three years. Here again, since the position is for a specified term, the director would be protected from a politically motivated dismissal under § 15.10(a) during his term of office. Similarly, members of the board of assessment review are protected by § 15.10(a) during their six-year term.

In contrast to the above, under art. XIII the members of the park and recreation commission, the industrial development commission, and the conservation commission serve "at the pleasure of the manager." Since this phrase "at the pleasure of the manager" has been used in place of a specified term, individuals serving on these commissions are not protected from politically motivated dismissals under the charter. Also, the town sergeant serves "at the pleasure of the manager." He likewise has no protection under the charter.[9]

When the charter creates positions within the town and provides for neither a speci-

fied term nor an "at pleasure" term, art. XV, § 15.03, applies:

> "The term of office of all offices, members of boards, commissions or committees appointed with the approval of the council, or appointed or elected by the council, shall be concurrent with the term of the council, unless otherwise provided in this charter."

Thus, this section applies to such individuals as the director of finance, the tax assessor, and the director of public works. Since their positions are not "at the pleasure of the manager," they have protection from politically motivated dismissals during the term of the council.

 Our conclusions based on our reading of the charter give effect both to the prohibition against political dismissals when the position is not specifically designated "at the pleasure of the manager" and to those positions that are so designated. Also, our decision is in accordance with the rule of construction asserting that when a statute is construed, effect must be given to all of its parts in order to give force to it and preserve it in its entirety. *St. Clare Home v. Donnelly*, 117 R.I. 464, 470, 368 A.2d 1214, 1218 (1977). To have decided this issue differently would have been to emasculate the clear provision that the solicitor serve at the town manager's "pleasure." Furthermore, this result is in accordance with the rule of construction that general terms be construed as limited by more specific terms. *See State v. Dussault*, R.I., 403 A.2d 244, 246 (1979).

 Our interpretation of the charter is also applicable to the assistant solicitors whose appointments are the province of the solicitor. This application is based on the language of § 7.01 of the charter, which provides for the appointment of assistant town solicitors "in like manner" to the appointment of the solicitor. When the language of a statute expresses a clear and sensible meaning, such meaning is presumed to be intended and must be applied

---

9. Our point here is only that the town sergeant is not protected from a politically motivated dismissal under the provisions of the charter.

Such a dismissal may well be subject to limitations expressed in *Elrod* and *Branti*, both *supra*, however.

literally. *Conrad v. Town of Narragansett Board of Canvassers*, R.I., 420 A.2d 50, 51 (1980). Here the clear and sensible meaning is that while the solicitor serves at the pleasure of the manager, the assistant solicitors serve at the pleasure of the solicitor. Consequently, the general provision against politically motivated dismissals is inapplicable for the same reasons as in the case of the solicitor.

### VI

 Finally, the plaintiffs claim that the defendants conspired to violate their rights under 42 U.S.C.A. § 1983. This contention is without merit because the plaintiffs base this claim on their belief that their politically motivated dismissals violated the First and Fourteenth Amendments. Since they enjoy no constitutional protection, there is no deprivation pursuant to § 1983.

The plaintiffs' appeal is denied and dismissed, the judgment below is affirmed, and the papers of the case are remanded to the Superior Court.